UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KEENAN ROBINSON, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| V. | )    Case No. 4:12CV956NCC |
| | ) |
| THE STATE OF MISSOURI, et al., | ) |
| | ) |
| | ) |
|     **Defendants.** | ) |

## MEMORANDUM AND ORDER

Before the court is the Motion for Summary Judgment filed by Defendants Don Pokorny and Chad Davenport. (Doc. 36). The matter is fully briefed and ready for disposition. The parties have consented to the jurisdiction of the undersigned United Sates Magistrate Judge. (Doc. 42). See 28 U.S.C. § 636(c).

## STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is

1

genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

The moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

Where the non-moving party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e).

In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255; Matsushita Elect. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of Defendants' motion.

## BACKGROUND and UNDISPUTED FACTS[1]

This action arises out of Plaintiff Keenan Robinson's allegation, in his Amended Complaint, that Defendants Don Pokorny and Chad Davenport, failed to provide him with proper medical care, in violation of 42 U.S.C. § 1983, while he was incarcerated under Defendants' supervision. Plaintiff sues Defendants in their individual capacities, and specifically claims they failed to transport him to a competent medical provider, including a pediatric hand specialist; failed to comply with instructions and warnings from Plaintiff's treating physician; and failed and refused to carry out Plaintiff's physician's treatment plans and orders, including that Plaintiff have surgery for a mal-union of the right hand. Plaintiff further contends that Mary E. Rashid, M.D., diagnosed him with a mal-union in his hand; she stated that Plaintiff should have this mal-union surgically repaired; and, by the time Defendants sought medical treatment for Plaintiff, other than initially splinting his injury, the fracture had already healed with a mal-union deformity. (Doc. 10).

Defendants contend, in their pending Motion for Summary Judgment, that they are entitled to summary judgment in their favor on Plaintiff's claim of a failure to provide medical treatment and, alternatively, that they are entitled to qualified immunity. (Doc. 36).

On February 15, 2011, the Circuit Court of St. Charles County, Family Court Division, entered an Order and Judgment committing Plaintiff to the legal and physical custody of the Division of Youth Services (DYS) for an indefinite term. The DYS is a State agency, charged with the care and treatment of delinquent youth committed to its custody by one of Missouri's juvenile courts. (Doc. 37-3).

---

[1]The facts are undisputed unless otherwise stated.

Before Plaintiff's commitment to the DYS, on February 14, 2011, he was examined by Dr. Thomas Applewhite for an injury to his right hand. Dr. Applewhite diagnosed Plaintiff with a healing fracture of the distal second metacarpal. Dr. Applewhite noted that there was no significant displacement or misalignment. On February 18, 2011, Plaintiff received a nursing assessment. The assessment noted that Plaintiff had suffered an injury to his right hand in December 2010; he had received no treatment at that time; Plaintiff was able to move all five fingers in his right hand; and there was only mild swelling in Plaintiff's right hand. On February 22, 2011, Plaintiff was seen for a physical examination by Dr. Maria Dunston. Dr. Dunston noted that Plaintiff had a healing fracture in his right hand.

On Saturday, March 19, 2011, Plaintiff complained of right hand pain and was referred to a doctor for examination. On March 28, 2011, Plaintiff injured his right hand when he hit it on a desk during school. He was seen by Registered Nurse Hulse. Nurse Hulse noted that Plaintiff had moderate swelling and prescribed a treatment of ice and bandaging. Further, Nurse Hulse ordered that Plaintiff be seen by urgent care if the injury was not better by the following morning, and noted that Plaintiff had a prior fracture to the same hand.

On March 29, 2011, Plaintiff was examined by Dr. Wendolyn DiSalvo in the emergency room at Christian Hospital. Dr. DiSalvo ordered an x-ray of Plaintiff's right hand; diagnosed Plaintiff with a fracture of the neck of the metacarpal and a sprained finger, and prescribed Motrin and Percocet for pain relief. Dr. DiSalvo noted that any recommendations for surgery would need to come from an orthopedic doctor. Plaintiff's hand x-ray was reviewed by Dr. Paul Busse. Dr. Busse diagnosed Plaintiff with a healing fracture of the distal second metacarpal and noted that there was no acute injury. Specifically, the x-ray report of this date states that Plaintiff had a "healed or healing fracture of the distal end of the second metacarpal with considerable

4

periosteal new bone formation"; "acute fracture or dislocation [were] not seen elsewhere." The impression was "old healed or healing fracture distal second metacarpal" and "negative for acute osseous injury." (Doc. 39-7, DYS 594).[2]

On April 1, 2011, Plaintiff received a follow-up assessment of his hand by Nurse Hulse. Nurse Hulse noted that there was mild swelling of the right hand and recommended an orthopedic appointment and that Plaintiff's hand be kept immobile, using a splint and wrap. Nurse Hulse also prescribed pain medication. On April 5, 2011, Plaintiff was seen by Dr. Dunston for treatment of his right hand. Dr. Dunston noted that the previously performed x-ray showed a healing fracture and no acute fracture or dislocation. Dr. Dunston also noted slight swelling over the M-P joint, and prescribed the continued use of a brace and a follow-up appointment in three weeks.

On April 11, 2011, Plaintiff was taken to Cardinal Glennon Children's Medical Center for an appointment with Dr. Rashid, an orthopedic specialist, for his right hand injury. Dr. Rashid diagnosed Plaintiff with a closed fracture of the neck of the metacarpal and instructed Plaintiff to return for a follow-up visit in September 2011, at which time an x-ray would be obtained. This doctor prescribed acetaminophen for Plaintiff to use as needed. (Doc. 39-7, DYS 598). On physical examination of Plaintiff's right hand, Dr. Rashid reported that Plaintiff had "mild swelling, tenderness of the index metacarpal with no instability; ligaments intact." (Doc. 45-4 at 5). Dr. Rashid also reported as follows:

> PLAN: We recommend the patient be cleared for return to activities with the understanding that he would benefit from surgical correction of the malunion. He will return in September after he is released from the state with his father to

---

[2] Defendants' exhibits attached to their Motion are labeled with page numbers prefaced by the term "DYS." The court has adopted this style when referring to these exhibits in this Memorandum and Order.

discuss further surgical options. They will call in the interim with questions or concerns.

(Doc. 45-4 at 6).

Plaintiff contends that additionally, on this date, Dr. Rashid recommended a referral to a juvenile orthopedic hand specialist. (Doc. 46 (Plaintiff's Answers to Defendants' Statements of Uncontroverted Material Facts, hereafter "Pl. Ans.") ¶ 21). Medical records of this date, however, do not reflect such a recommendation. (DYS 598). As authority for his assertion that Dr. Rashid recommended a referral, Plaintiff cites his and his father's affidavits. These affidavits do not reference an orthopedic referral on April 11, 2011, but rather state that Dr. Rashid indicated, at an unspecified date, that Plaintiff needed surgery to repair his hand. (Doc. 45-3 (Pl. Aff.) ¶ 4; Doc. 45-1 (Ricky Robinson Aff.) ¶ 3).

Plaintiff's father met with Dr. Rashid on May 16, 2011, "regarding possible operative therapy for his son." Dr. Rashid discussed the "risks and benefits of the procedure with Plaintiff's father, including "infection, tendonitis from hardware irritation and nonunioin." Dr. Rashid's records reflect that Plaintiff's father was "concerned about the retained plate and screws and want[ed] to think about surgery." Plaintiff and his father were to see Dr. Rashid on a "p.r.n. basis." (Doc. 45-4 at 8).

On July 7 and 22, and August 9, 13, and 14, 2011, Plaintiff complained of right hand pain or knuckle and index finger pain. Defendants contend, and Plaintiff denies, that Plaintiff refused medical treatment for his symptoms on these dates.[3] (Doc. 37-1 (Defendants' Statements of Uncontroverted Material Facts, hereafter "DSUMF") ¶¶ 23-27; Doc. 46, Pl. Aff. ¶10).

---

[3] In response to Defendants' assertion that Plaintiff refused treatment, Plaintiff has stated he never refused "treatment by an orthopedic specialist for his broken hand." Defendants, however, did not make such an assertion; they did not describe the type of treatment Plaintiff refused. Notably, the nursing notes of these dates reflect that Plaintiff refused treatment. (DYS 443, 446).

Nurse Hulse's notes of August 23, 2011, reflect that Plaintiff's father called and stated that he wanted his son to have his "hand fixed now & not wait till he got released"; Nurse Hulse told Plaintiff's father that they were "following orthopedic order[s] & orth stated in writing that it could wait until [Plaintiff's] release." Nurse Hulse's notes further reflect that she then notified Dr. Dunston of the father's call; Dr. Dunston instructed her to find out when Plaintiff was to be released; and Dr. Dunston said she would talk to orthopedics. Nurse Hulse's notes also reflect that Plaintiff's father called again on August 24, 2011, and, after becoming upset with what he was told, said he would be calling his attorney, and hung up. (DYS 441).

Plaintiff's medical records reflect that, on October 6, 2011, Plaintiff was transported to Cardinal Glennon Children's Medical Center, where he was examined by orthopedic surgeons Jessica C. McMichael, M.D., and Philip Sinatra, M.D. (Doc. 45-4 at 10-11). Dr. McMichael reported, pursuant to physical hand examination, that Plaintiff had "no swelling. Right IF mildly shortened, with no rotational deformity. Can flex nearly to distal palmar crease. Intact sensation to light touch. . . . C/O 'weird feeling' but no gross tenderness to palpation of fracture sight. Brisk capillary refill. 5/5 grip strength." (Doc. 45-4 at 10). Additionally, Dr. McMichael reported:

> Discussed with patient and patient's father the risks and benefits of surgery. It is unclear if the patient's discomfort with writing is related directly to the malunion of the right 2nd metacarpal head and surgical correction of his metacarpal mal-union may not guarantee symptom resolution. He currently is *highly functional*, however, has additional cosmetic concerns. It is our recommendation to *continue non-operative management due to morbidity risks of surgery*. However, he and his father would like to pursue a 2nd opinion, we recommend follow-up with our incoming hand surgeon Dr. Panattoni. We will give clinic phone number to patient and his family to schedule clinic appointment with Dr. Panattoni when available.

(Id. at 11) (emphasis added).

Dr. McMichael also stated that Plaintiff had been seen by Dr. Rashid, who discussed "osteotomy, ORIF," and that Plaintiff and his father "verbalize their understanding of the risks/benefits of surgery, but had to defer surgery until release by state custody due to safety concerns. He is here today to reestablish care. *Currently doing well and only complains of vague hand pain when writing*. Otherwise, fully functional." (Id. at 10) (emphasis added).

October 6, 2011 medical records reflect Plaintiff was instructed to follow-up if his symptoms worsened or failed to improve. Medical records of this date further reflect that no activity restrictions were imposed on Plaintiff, or medications prescribed, and Plaintiff was to have a return appointment with Dr. Panattoni, "when available."[4] (Doc. 39-7, DYS at 592; Doc. 45-4 at 9).

On Saturday, November 12, 2011, Plaintiff complained of right hand pain after he hit his bunk. Plaintiff was monitored and reevaluated the following morning. (Doc. 37-1, ¶ 29, Doc. 46, ¶ 29).

On November 14 and 28, and December 6 and 7, 2011, Plaintiff complained of right hand pain. Defendants contend, and Plaintiff denies, that Plaintiff refused treatment for his symptoms on these dates.[5] (Doc. 37-1, DSUMF ¶¶ 30-33; Doc. 46, Pl. Ans. ¶¶ 30-33). On December 9, 2011, Plaintiff complained of right hand pain and was given ibuprofen for his symptoms. On December 19, 2011, when he complained of right hand pain, Plaintiff was referred to a doctor for examination.

---

[4] Defendants incorrectly attribute Dr. McMichael's records to Dr. Panattoni. Plaintiff did not object to this error. (Doc. 37-1, DSUMF ¶ 28; Doc. 46, Pl. Ans. (Doc. 46, ¶ 28).

[5] See n.2; Doc. 39-2, DYS 430-31, 434 (nurse's notes reflecting Plaintiff refused treatment).

On Tuesday January 24, 2012, Plaintiff complained of right hand pain. Defendants contend, and Plaintiff disputes, that Plaintiff refused treatment on this date.[6]

On January 27, 2012, Plaintiff was released from DYS's custody to his father, Ricky Robinson.

During the time relevant to Plaintiff's First Amended Complaint, Defendant Don Pokorny was the Regional Administrator for the DYS's St. Louis Region. He was responsible for all agency operations in the St. Louis region, including residential care, non-residential services, and business and administrative functions. Defendant Pokorny provided direct supervision of the Service Coordination units as well as supervision of three Assistant Regional Administrators in the region. He had no involvement in the day to day operations of Missouri Hills, Spanish Lake Campus.

In response to Defendants' assertion that Defendant Pokorny had no involvement with Plaintiff's medical care (Doc. 37-1, DSUMF ¶ 6), Plaintiff alleges that Defendant Pokorny "had the authority to direct and duty to direct Plaintiff's requested medical care by a juvenile orthopedic hand specialist" (Doc. 46, Pl. Ans. ¶ 6). To support this allegation, Plaintiff has provided a computer printout which merely reflects that Defendant Pokorny is the "Designated Principal Assistant, Administrative Services, Non-Residential Care and Southeast Region," and which lists staff working under him. (Doc. 45-2). This printout does not even suggest that Defendant Pokorny "had the authority to direct and duty to direct Plaintiff's requested medical care by a juvenile orthopedic hand specialist"; thus, the court deems Defendants' factual allegation regarding Defendant Pokorny's involvement in Plaintiff's medical care undisputed. Fed. R. Civ. P. 56(e)(2).

---

[6] See n.2; Doc. 39-2, DYS 417 (nurse's notes reflecting Plaintiff refused treatment).

Defendant Chad Davenport is employed as the Facility Manager for Cottage 7, Spanish Lake, where Plaintiff was housed after his commitment to DYS. Defendant Davenport, who is not a medical doctor, does not have any involvement in conducting medical exams or diagnosing medical complaints. Defendants allege, and Plaintiff denies, that while he was living in Cottage 7, Defendant Davenport "did not see him with any injury that caused [him] to believe that he had a need for immediate medical care beyond the care he was receiving from medical staff." (Doc. 37-1, DSUMF ¶ 8).

In support of his denial of this suggested undisputed fact, Plaintiff asserts that, while he was living in Cottage 7, a meeting was held between his father, Ricky Robinson, and Defendant Davenport, wherein a recommendation by Dr. Rashid for a referral to a juvenile orthopedic hand specialist was discussed and requested and demanded by Plaintiff's father. Also, in response to Defendants' contention that Defendant Davenport did not see Plaintiff with an injury that caused him to believe Plaintiff had a need for immediate medical care beyond what he was receiving, Plaintiff has provided an August 29, 2011 letter sent by his counsel to Defendant Pokorny—not to Defendant Davenport—stating that Plaintiff injured his right hand and required the services of an orthopedic specialist "to determine how best to provide surgical correction of a malunion in the hand." The letter further states that it was "a renewed demand for immediate treatment with an orthopedic surgeon." (Doc. 45-1).

## LEGAL FRAMEWORK and DISCUSSION

**A. Standard for Cause of Action for Deliberate Indifference to Serious Medical Needs**

The failure to provide medical care to a prisoner violates the Eighth Amendment when it involves a deliberate indifference to serious medical needs. Estelle v. Gamble, 429 U.S. 97, 103-106 (1976) (opining that an inadvertent failure to provide adequate medical care and negligence

in treating a medical condition does not necessarily present a constitutional violation; in order to establish a cognizable claim for the failure to provide adequate medical care, a prisoner must set forth facts showing that a defendant acted with "deliberate indifference to [the prisoner's] serious medical needs"). See Langford v. Norris, 614 F.3d 445, 460-61 (8th Cir. 2010). To show the prison officials failed to provide adequate medical treatment, a prisoner must prove "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004). See also Johnson v. Hamilton, 452 F.3d 967, 972 (8th Cir. 2006).

"Serious medical need" has been defined as a medical need which "has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). Deliberate indifference extends to prison officials who "intentionally deny[] or delay[] access to medical care or intentionally interfere[] with [] treatment once it is prescribed." Holden v. Hirner, 663 F.3d 336, 342 (8th Cir. 2011). See also Popoalii v. Corr. Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008) ("A prima facie case alleging deliberate indifference requires the inmate-plaintiff to demonstrate that she suffered from an objectively serious medical need and the 'prison officials actually knew of but deliberately disregarded' that need."). However, more than mere negligence and even gross negligence are required to establish deliberate indifference. "Deliberate indifference is akin to *criminal recklessness*, which demands more than negligent misconduct." Id. (emphasis added). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis.'" Holden, 663 F.3d at 342 (quoting Reece v. Groose, 60 F.3d 487, 491 (8th Cir. 1995)).

11

Mere negligence does not establish a constitutional violation. Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997). Also, the mere delay in an inmate's receiving surgery for a serious medical condition does not establish an Eighth Amendment violation where the inmate cannot establish that the delay adversely affected his prognosis. See Dulany, 132 F.3d at 1243. A plaintiff must prove that, due to the delay, he was harmed; that the harm done was "objectively, sufficiently serious"; and that "a prison official [was]... deliberately indifferent to the prisoner's condition." Reece v. Groose, 60 F.3d 487, 491 (8th Cir. 1995) (citing Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995) (abrogation on other grounds recognized by Reece, 60 F.3d at 492). An inmate who alleges delay in medical care that rises to the level of an Eighth Amendment violation, "must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment." Beyerbach, 49 F.3d 1324, 1326 (8th Cir. 1995) (emphasis in the original). In Beyerbach, the Eighth Circuit found no constitutional violation where there was delay in treatment to an inmate's broken hand. Id. at 1326.

Additionally, an inmate does not have a right to a particular course of treatment nor does an inmate establish deliberate indifference by showing that another doctor might have ordered a different course of treatment than that actually taken. Dulany, 132 F.3d at 1239 ("[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment."). See also Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996) ("Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment."). Moreover, an inmate does not establish deliberate indifference by showing disagreement among doctors as to the proper course of treatment. See Vaughn v. Lacey, 49 F.3d 1344, 1345 (citing Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990) (mere disagreement

12

with a course of treatment does not state a constitutional claim cognizable under 42 U.S.C. § 1983)). See also Davis v. Hall, 992 F.2d 151, 153 (8th Cir. 1993) (holding that a dispute over the course of treatment fails to state a claim of deliberate indifference); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990); Scherrer v. Stephens, 50 F.3d 496, 497 (8th Cir. 1994) (disagreement with a course of treatment does not state a constitutional claim).

Where the treatment received by an inmate may not have been as extensive as that which would have been given by a private health-care provider, an inmate does not necessarily establish deliberate indifference. Logan v. Clarke, 119 F.3d 647, 650 (8th Cir. 1997) ("[E]fforts the prison doctors took to allay [the plaintiff's] pain, while perhaps not as extensive as those a private health-care provider might have taken, did not reflect deliberate indifference to his medical needs."). Further, an inmate's hearsay testimony regarding alleged statements or diagnoses by doctors does not create a material issue of fact. See e.g., Mays v. Rhodes, 255 F.3d 644, 648 (8th Cir. 2001). Bare assertions are insufficient to support a claim of deliberate indifference to serious medical needs. Aswegan v. Henry, 49 F.3d 461, 465 (8th Cir. 1995). An inmate has the burden of proof to show causation between the alleged acts and the alleged damage. Robinson v. Hager, 292 F.3d 560 (8th Cir. 2000).

"Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990). It is not enough for plaintiff to prove that his rights were violated. For § 1983 liability, a plaintiff must show that defendants were each personally involved in the deprivation of his constitutional rights. Wilson v. Northcutt, 441 F.3d 586, 591 (8th Cir. 2006) (liability for damages for a federal constitutional tort is personal so each defendants' conduct must be independently assessed). Further, defendants cannot be held liable for constitutional violations under the theory

13

of respondeat superior because they held supervisory positions. See Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001); Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) ("[A] general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability.").

**B.     Plaintiff's Claims**

For purposes of the pending Motion, the court will assume Plaintiff's broken hand was a serious medical condition. See, e.g., Johnson, 452 F.3d at 973 (finding that a fractured finger was an objectively serious medical need). The court finds, however, that summary judgment should be granted in Defendants' favor for numerous reasons. First, Plaintiff did receive medical treatment for his hand injuries. Not only was he seen on a regular basis by DYS medical staff, but he was taken to the emergency room when he reinjured his hand and was seen, on two occasions, at Cardinal Glennon Children's Hospital for consultations.

Second, although Dr. Rashid opined that Plaintiff would benefit from surgery, Dr. McMichael specifically recommended that Plaintiff not have surgery. Plaintiff has no constitutional right to a particular course of treatment, especially when there are differing opinions as to recommended treatment. See Davis, 992 F.2d at 153; Randall, 642 F.2d at 308.

Third, Plaintiff's medical records do not reflect that any doctor, including Dr. Rashid, recommended *immediate* surgery or surgery before Plaintiff was released from DYS custody, or reported that Plaintiff would be harmed by the delaying of surgery until after his release from DYS. Specifically, when Dr. Dunston examined Plaintiff shortly after his arrival at Cottage 7, she reported that his old healing fracture was "all resolved," and her examination of his right hand showed "no deformity." Moreover, she placed no restrictions on Plaintiff's activities. (DYS 611). Then, in March 2011, after Plaintiff re-injured his hand when he hit a desk, an x-ray

14

showed he was negative for acute osseous injury. (DYS 594). Medical records reflect that Dr. DiSalvo, who saw Plaintiff in the emergency room at Christian Hospital, did not recommend surgery; Plaintiff's hand was splinted; and Dr. DiSalvo prescribed Motrin and Percocet, as needed, for pain, and recommended that Plaintiff ice his hand. (DYS 600-601; Doc. 45-5 at 4-22). On April 5, 2011, when Plaintiff presented with hand swelling, Dr. Dunston recommended Plaintiff continue to use a brace until he was pain free and that he return in three weeks for an assessment. (DYS 481). On April 11, 2011, Dr. Rashid did not recommend immediate surgery, and noted Plaintiff need not return until September 2011, assuming that he would be released from custody by that date. In any case, Dr. Rashid noted possible risks of surgery. (Doc. 45-4 at 6).

When Plaintiff returned to Cardinal Glennon Children's Hospital, in October 2011 for follow-up of his hand injury, Dr. McMichael noted that surgery might not resolve Plaintiff's problem with his hand and that Plaintiff had cosmetic concerns regarding his hand. Significantly, Dr. McMichael recommended Plaintiff *not have surgery* due to morbidity risks of surgery, and also recommended Plaintiff see Dr. Panattoni, a hand specialist, for a second opinion. Significantly, no restrictions were placed on Plaintiff as a result of Dr. McMichael's consultation, and he was told to return if his symptoms worsened. (DYS 592; Doc. 45-4 at 9). Thus, the undisputed facts contradict Plaintiff's assertions that Dr. Rashid or any other doctor recommended immediate surgery, surgery prior to Plaintiff's release from custody, or opined that Plaintiff would be harmed by delaying surgery. See Dunlay, 132 F.3d at 1243; Reece, 60 F.3d at 491.

Fourth, the delay in Plaintiff's receiving surgery for his hand until after his ultimate release from DYS's custody fails to establish an Eighth Amendment violation because Plaintiff

15

has not demonstrated that the delay adversely affected his prognosis, see Dulany, 132 F.3d at 1243, or that he suffered harm which was "objectively, sufficiently serious" as a result of his not having surgery while committed to DYS's custody, see Reece, 60 F.3d at 491. Significantly, the record does not reflect that Plaintiff's symptoms worsened after he saw Dr. Rashid in April 2011. As noted above, Dr. McMichael reported, in October 2011, that Plaintiff was "doing well," only complained of "vague hand pain," and was "[o]therwise, fully functional." Moreover, on physical exam, in October 2011, Plaintiff had intact sensation and no tenderness at the fracture site. (Doc. 45-4 at 10).

Fifth, although Plaintiff and his father may have preferred—and actually demanded—that Plaintiff receive surgery prior to his release, the failure of Defendants or anyone else affiliated with DYS to acquiesce to their wishes or demands does not violate the Eighth Amendment, given Plaintiff's failure to demonstrate a resulting negative affect on his prognosis. See Logan, 119 F.3d at 650. Moreover, Plaintiff's merely stating that Dr. Rashid stated that Plaintiff needed surgery prior to his release or immediately, without documentary support, is insufficient to create a material issue of fact as to her recommendation. See Mays, 255 F.3d at 648. As discussed above, medical records refute Plaintiff's claim that Dr. Rashid or any other doctor recommended immediate surgery or surgery prior to Plaintiff's release.

Sixth, even assuming that Defendant Pokorny and Defendant Davenport knew of Plaintiff's serious medical need, the undisputed facts fail to establish that they deliberately disregarded it. See Hartsfield, 371 F.3d at 457. Plaintiff's unsupported assertions that they did so are insufficient to withstand summary judgment. See Anderson, 477 U.S. at 247. Further, the undisputed facts fail to establish that either Defendant Pokorny or Defendant Davenport was personally involved in the alleged deprivation of Plaintiff's constitutional rights. See Wilson,

441 F.3d at 591.  To the extent Plaintiff suggests that either Defendant is liable based on their supervision of others, Plaintiff's allegation of respondeat superior liability is insufficient to establish a constitutional violation.  See Tlamka, 244 F.3d at 635; Keeper, 130 F.3d at 1314.

Seventh, Plaintiff has not established deliberate indifference to his serious medical condition merely because his treatment may not have been as extensive as that which would have been given by a private health-care provider.  Thus, even though the record does not reflect that he saw Dr. Panattoni pursuant to Dr. McMichael's recommendation, Plaintiff has failed to establish a constitutional violation.  See Logan, 119 F.3d at 650.  Moreover, Dr. McMichael's October 6, 2011 records reflect that Dr. Panattoni was not yet at Cardinal Glennon Children's Hospital (he was the hospital's "incoming hand surgeon"), and that Plaintiff should see this doctor when he was available.  Plaintiff has failed to provide any evidence of Dr. Panattoni's availability.  In any case, Dr. McMichael only sought Dr. Panattoni's consult as a second opinion.

Eighth, despite Plaintiff's assertions that he should have received immediate surgery or surgery prior to his release, he fractured his hand in December 2010, and had not had it treated prior to entering DYS custody in February 2011.

Ninth, and most significantly, Plaintiff has *failed to place any medical evidence in the record to verify his allegation of a detrimental effect in the delay of his medical treatment*. Beyerbach, 49 F.3d at 1326 (finding summary judgment should have been granted for defendants where inmate, who complained that delay in medical treatment violated the Constitution, failed to place verifying medical evidence in the record to establish the detrimental effect of delay).

The court finds, therefore, that Plaintiff has failed to establish deliberate indifference to his serious medical needs, in violation of the Constitution, and that summary judgment should be granted in favor of Defendants. See Hartsfield, 371 F.3d at 457.

## C. Qualified Immunity

"In a § 1983 action, state actors may be entitled to qualified immunity." McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (citation omitted). Qualified immunity may shield a government official from liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law, not a question of fact. McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)(emphasis in original).

In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court held that there are two prongs to a qualified immunity analysis. A court must consider both whether a *constitutional right has been violated* and whether that *right had been clearly established* at the time of the alleged violation. The Court further held in Pearson, that, while often appropriate, is not mandatory to consider these issues in any particular sequence. Under Pearson, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

Given that Plaintiff has failed to establish that Defendants deliberately denied him medical care for his serious medical condition, in violation of the Constitution, the court further finds that Defendants are entitled to qualified immunity. See Pearson, 555 U.S. at 236.

Accordingly,

**IT IS HEREBY ORDERD** that the Motion for Summary Judgment (Doc. 36) filed by Defendants Don Pokorny and Chad Davenport is **GRANTED**;

**IT IS ORDERED** that a separate judgment will be entered incorporating this Memorandum and Order.

Dated this 13th day of June, 2014.

/s/ Noelle C. Collins  
UNITED STATES MAGISTRATE JUDGE